IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

Civil Action No.

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION,

     Plaintiff,

v.

ROOSEVELT TOBIAS BAILEY,
BORG INVESTMENT BANK &
CAPITAL TRUST, and
ALVIN CHRISTOPHER JONES,

     Defendants, and

BORG GLOBAL HOLDINGS, LLC,

     Relief Defendant.

---

## COMPLAINT AND JURY DEMAND

---

Plaintiff, United States Securities and Exchange Commission ("SEC"), for

its Complaint against Defendants Roosevelt Tobias Bailey ("Bailey"), Borg

Investment Bank & Capital Trust ("Borg Bank"), and Alvin Christopher Jones

("Jones") (collectively, "Defendants") and Relief Defendant Borg Global Holdings,

LLC ("Borg Global" or "Relief Defendant"), alleges:

1

## INTRODUCTION

1.      Through an entity called Borg Bank, Bailey raised approximately $1.6 million by offering and selling fraudulent investments to the public on the promise of astronomical returns obtainable over short periods of time with little or no risk of principal loss to investors. Contrary to these representations, investors never received their promised returns and most lost all of their investment while Bailey profited.

2.      Borg Bank, through Bailey, offered and sold two types of investment contracts under this guise: one in which an investor would front fees to supposedly "lease" and "monetize" high-value purported bank instruments called standby letters of credit ("SBLC") and another where investors' money would be pooled and invested in supposedly lucrative gold and diamond investments in Africa and South America.

3.      In reality, Borg Bank never leased or monetized SBLCs as it said it would and it obtained only a few precious stones that Bailey sold for minimal profit. Instead, substantial amounts of investors' funds were directed to Bailey's personal benefit, including to buy him furs and furniture, pay his credit card bills, and pay fees for his personal real estate deals that never closed. Of the approximately $1.6 million raised, Bailey disbursed or directed to be disbursed at least $410,000 for his benefit, either transferring investor money to his own bank

accounts or making payments to third parties for his benefit, sent at least $163,000 to an account for another company he controlled, Relief Defendant Borg Global, and made approximately $250,000 in Ponzi payments to earlier investors.

4.      As part of the scheme, Bailey directed the majority of investors to send their investments to an Interest on Lawyer's Trust Account ("IOLTA") held by Defendant Jones, an attorney and former Florida prosecutor, who disregarded numerous red flags as he provided substantial assistance to Bailey and Borg Bank's fraud. Jones received numerous investor complaints that Bailey and Borg Bank were engaged in fraud or misusing the money that Jones was collecting on their behalf, yet Jones continued to facilitate the scheme's financial transactions and collect fees for that work.

5.      By engaging in this conduct, Bailey and Borg Bank violated Section 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a), Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Exchange Act Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5 (13 FR 8183, Dec. 22, 1948, as amended at 16 FR 7928, Aug. 11, 1951). For his part, Jones aided and abetted Bailey and Borg Bank's violations of Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Exchange Act Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5. Unless

restrained and enjoined, Defendants will continue to violate the federal securities laws.

## DEFENDANTS

6.    **Borg Bank** is a Washington, D.C. statutory trust formed on October 26, 2018, with its principal place of business in Duluth, Georgia. Bailey is the chairman, president, CEO, and sole managing trustee of Borg Bank, which has no other employees.

7.    **Bailey**, age 67, is a resident of Buford, Georgia. In addition to Borg Bank, Bailey owns and solely controls other corporate entities that use the "Borg" name, including Borg Global. In 2001, Bailey was convicted of felony copyright infringement and tax evasion.

8.    **Jones**, age 55, is a resident of Tampa, Florida. Jones is an attorney licensed in Florida and a former state prosecutor. During the relevant period, he owned and managed his own firm, Alvin C. Jones, P.A.

## RELIEF DEFENDANT

9.    **Borg Global** is a Georgia limited liability company formed on September 25, 2017. Bailey solely owns and controls Borg Global, which received at least $163,000 in misappropriated investor funds.

## JURISDICTION AND VENUE

10.     The SEC brings this action pursuant to authority conferred on it by

Sections 20(b), 20(d)(1), and 20(e) of the Securities Act [15 U.S.C. §§ 77t(b),

77t(d)(1), and 77t(e)] and Sections 21(d)(1), (2), (3), (5) and (7), and 21(e) of the

Exchange Act [15 U.S.C. §§ 78u(d)(1), (2), (3), (5), and (7) and 78u(e)] to restrain

and enjoin the Defendants from engaging in the acts, practices, and courses of

business described in this Complaint and similar acts, practices, and courses of

business. The SEC seeks permanent injunctions, disgorgement of ill-gotten gains

derived from the conduct alleged in the Complaint plus prejudgment interest

thereon, and civil penalties as well as an officer and director bar against Bailey.

The SEC also seeks disgorgement of ill-gotten gains plus prejudgment interest

thereon from the Relief Defendant.

11.     Defendants, directly or indirectly, singly and in concert, made use of

the means or instruments of transportation or communications in interstate

commerce, the means or instrumentalities of interstate commerce, or of the mails,

in connection with the transactions, acts, practice, and courses of business alleged

in this Complaint, certain of which occurred within this District.

12.     This Court has jurisdiction over this action pursuant to Sections 20(b),

20(d)(1), 20(e), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d)(1),

77t(e) and 77v(a)], and Sections 21(d)(1), (2), (3), (5), and (7), 21(e), and 27(a) of

the Exchange Act [15 U.S.C. §§ 78u(d)(1), (2), (3), (5), and (7), 78u(e), and

78aa(a)].

13.     Venue is proper in the Northern District of Georgia pursuant to

Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27(a) of the

Exchange Act [15 U.S.C. § 78aa(a)] because certain of the acts and transactions

constituting violations of the Securities Act and the Exchange Act occurred in this

District, including the offer and sale of securities and the misappropriation of

investor funds through transactions at banks located in this District. In addition,

Bailey resides and transacts business in, and Borg Bank's principal place of

business is in, this District.

14.     On or about September 13, 2023, Bailey and Borg Bank agreed to toll

the statute of limitations from September 13, 2023 through June 11, 2024. On or

about April 19, 2024, Bailey and Borg Bank agreed to further toll the statute of

limitations for the period of June 12, 2024 through September 10, 2024.

## FACTUAL ALLEGATIONS

## I.   BAILEY OPERATED AND CONTROLLED BORG BANK.

15.     Bailey formed Borg Bank on October 26, 2018. Bailey was the

chairman, president, CEO, and sole managing trustee of Borg Bank. Borg Bank

had no other directors, officers, or trustees, did not carry out any traditional

6

banking operations, was not chartered as a bank with any state, and was not registered with the SEC in any capacity.

16.     From at least November 2018 through in or about October 2022 ("the Relevant Period"), Borg Bank, through Bailey, developed and marketed investment programs. The primary investment program Borg Bank marketed is generally referred to as a "high-yield" or "prime bank" investment through which clients could have their assets invested at Borg Bank's discretion based on Borg Bank's representations that these investments would earn substantial returns over a short period of time with little or no risk.

## II.     BORG BANK, THROUGH BAILEY, OFFERED AND SOLD SECURITIES.

17.     Borg Bank, through Bailey, solicited potential investors and promoted two investment programs through direct verbal communications, conference calls, and Zoom meetings, during in-person meetings, and through email and WhatsApp messages.

18.     Bailey used his own contacts and "referral agents" to identify potential investors.

19.      Borg Bank, through Bailey, provided potential investors who expressed an interest in investing with an "Asset Placement and Management Agreement" ("APMA") for a particular investment program, either the Standby

Letter of Credit Investment Program ("SBLC Program") or the Micro-Cap Wealth Investment Program ("Micro-Cap Program").

20.     Those APMAs described the conditions under which Borg Bank purported it would take and use investor money for the promised investment schemes. As detailed below, these APMAs contained numerous false and misleading statements. In addition, under the APMAs, Borg Bank agreed to manage assets for trading or for "buy/sell investment purposes" and stated that Bailey had "full authority" over Borg Bank. The APMAs described Borg Bank as an entity involved in "global asset monetization," "leverage," and "global buy/sell trading activities."

21.     Borg Bank, through Bailey, prepared APMAs for the SBLC Program and Micro-Cap Programs. Bailey sent the SBLC and Micro-Cap Program APMAs to investors, and investors signed the documents and returned them to Bailey.

22.     When an investor agreed to invest with Borg Bank, the investor and Bailey, as Borg Bank's representative, signed an APMA that stated the investor's money would be used for one of the investment programs described above.

23.     Bailey directed most Micro-Cap Program investors to transfer their funds to an account belonging to Relief Defendant Borg Global. Bailey directed other investors to transfer their funds to Jones's law firm's IOLTA account. Jones

then transferred the investors' money, minus a fee for himself, pursuant to Bailey's directions.

24.    Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b(a)(1)] and Section 3(a)(10) of the Exchange Act [15 U.S.C. § 78c(a)(10)] define "security" to include any "investment contract."

25.    Borg Bank, through Bailey, offered and sold securities in the form of investment contracts in the SBLC Program and the Micro-Cap Program. The financial success or failure of the SBLC and Micro-Cap Programs offered by Borg Bank, through Bailey, was inextricably tied to the efforts of Bailey and Borg Bank. Investors had no role in the management of Borg Bank, the SBLC Program, or the Micro-Cap Program, and they relied exclusively on Bailey to manage Borg Bank and its investment programs and to conduct their business affairs.

26.    The SBLC and Micro-Cap investment programs offered and sold by Borg Bank, through Bailey, were "securities" as defined in Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act [15 U.S.C. §§ 77b(a)(1) and 78c(a)(10)].

## III.    BORG BANK'S INVESTMENT PROGRAMS

### A.    SBLC Program

27.    Under the SBLC Program, Borg Bank, through Bailey, sought and obtained investor funds on the representation that those funds would be used to pay

fees to lease and "monetize" an SBLC from one or more large international banks. During the Relevant Period, Borg Bank, through Bailey, raised over $1.4 million from at least 20 investors through SBLC Program investment contracts.

28.     An SBLC is a type of bank guarantee that is issued by a bank and promises payment on behalf of another party when certain conditions are satisfied. As part of Borg Bank's offerings, Bailey frequently employed the terms "standby letter of credit" and "SBLC," as well as other banking-industry terminology. Using these terms as he did created the false appearance that Bailey was steeped in and had substantial experience in the financial industry, when he did not, and had access to sophisticated financial products, when he did not. During the Relevant Period, before soliciting investors for Borg Bank's SBLC Program, Bailey and Borg Bank had never executed an SBLC transaction of the type offered as part of the SBLC Program.

29.     During the Relevant Period, Borg Bank, through Bailey, represented that investor funds could be used to acquire and "monetize" SBLCs. Borg Bank, through Bailey, represented that it would find a "monetizer," a company that would use an SBLC as collateral against its own credit line to obtain a loan, retain some of the proceeds from that monetization, and give the rest of the proceeds to Bailey, Borg Bank, and their investors. Borg Bank, through Bailey, represented to investors they could earn up to 16 times their initial investment in as short as 30 to

90 days. In reality, at the time Borg Bank was raising investor funds, Bailey knew Borg Bank could never "monetize" an SBLC to generate the astronomical returns Bailey, on behalf of Borg Bank, represented to investors because Bailey knew that (1) neither Bailey nor Borg Bank had ever successfully leased or "monetized" an SBLC with investor money, (2) Borg Bank, through Bailey, had misappropriated or misused nearly all investor money raised through the SBLC Program, and (3) Borg Bank, through Bailey, had used barely any investor money toward purported SBLC expenses.

### B.    Micro-Cap Program

30.    As detailed below, under the Micro-Cap Program, Borg Bank, through Bailey, sought and obtained investor funds by representing that such investments would be pooled and used to acquire gold and diamonds abroad, which they would later resell in the United States at a higher price. Borg Bank, through Bailey, raised approximately $230,000 from at least six investors from in or about October 2020 through June 2021 through Micro-Cap Program investments.

31.    During the Relevant Period, Borg Bank, through Bailey, represented that the Micro-Cap Program would provide short-term doubling of principal without investment risk. In reality, Borg Bank made a miniscule profit from the sale of a small number of precious stones and misappropriated investor funds, and most investors lost all of their investment.

11

**C.      Borg Bank, Through Bailey, Misappropriated and Misused Investor Money.**

32.      Borg Bank never monetized an SBLC and never engaged in the bulk purchase and resale of precious metals or stones. Instead, as alleged below, Borg Bank, through Bailey, used new investor money to make Ponzi payments to some early investors and directed substantial amounts of investors' money to be used for Bailey's personal benefit (including through transfers to Relief Defendant Borg Global), to buy furs and furniture, pay Bailey's credit card bills, and pay for fees for personal real estate deals that never closed.

33.      Throughout the Relevant Period, Borg Bank, through Bailey, raised over $1.4 million from at least 20 investors in the SBLC Program. Borg Bank, through Bailey, used approximately $230,000 to pay earlier investors, sent at least approximately $163,000 to Relief Defendant Borg Global, misappropriated approximately $362,000, and used the remainder to pay for purported business operations.

34.      From at least in or about October 2020 through June 2021, Borg Bank, through Bailey, raised over $230,000 from six investors in the Micro-Cap Program, paid over $25,000 to earlier investors, misappropriated approximately $47,000, and used the remainder to pay for purported business operations.

12

IV.   **BORG BANK, THROUGH BAILEY, MADE FALSE AND MISLEADING STATEMENTS TO INVESTORS IN CONNECTION WITH BORG BANK'S SECURITIES OFFERINGS.**

35.   In raising funds from investors in connection with the SBLC and Micro-Cap Programs, Borg Bank, through Bailey, made numerous written and oral materially false and misleading statements regarding, among other things, the use of investor funds, the "guaranteed" nature of the investments and magnitude of returns, or Bailey and Borg Bank's compensation.

A.   **Borg Bank, Through Bailey, Made False and Misleading Statements in Connection with the SBLC Program.**

36.   In raising funds from investors in connection with the SBLC Program, Borg Bank, through Bailey, made numerous materially false and misleading statements regarding, among other things, the use of investor funds, the "guaranteed" nature of the investment and substantial expected returns, and Bailey and Borg Bank's compensation being linked only to successful investments.

1.   **Statements Regarding the Use of Investor Funds**

37.   Borg Bank, through Bailey, made materially false and misleading statements in oral and written communications to investors and potential investors regarding the use of investors' funds in the SBLC Program, including that investor money would be used to pay fees to lease or acquire an SBLC from an established bank.

38.     Borg Bank's SBLC Program APMAs stated that in return for investors providing a specified amount of investment principal "to participate in the facilitation, acquisition, delivery and monetization of a Borg Investment Bank secured and delivered…[SBLC] from" various well-known banks "for project funding/financing via Borg Investment Bank," investors' funds would be "assigned and transferred to Borg Investment Bank and/or its nominated financial partners for asset management and SBLC acquisition activities." In exchange, "[Borg Bank] will provide [the investor] with rated and non-rated Bank Issued [sic] SBLC monetization packages and specialized financial deals." Borg Bank, through Bailey, represented that profits would stem "from monetization cash flows created" in connection with the leased SBLC.

39.     Borg Bank, through Bailey, made these or substantially similar representations in SBLC Program APMAs sent to investors and potential investors, including on or about November 21, 2018; February 3, 2021; July 15, 2021; August 4, 2021; September 4, 2021; September 23, 2021; October 6, 2021; April 21, 2022; and October 7, 2022.

40.     Borg Bank, through Bailey, made similar representations to investors regarding the use of funds by phone in or around March 2021 and during in-person meetings in New Jersey and New York in or around May 2021 and July 2021.

41.     The above statements regarding use of funds to acquire SBLCs were false and misleading when made because Borg Bank, through Bailey, (1) had used only a small percentage of investor funds toward SBLC-related expenses; (2) had immediately misappropriated or misused SBLC Program investor funds by, among other things, paying earlier investors (*i.e.*, Ponzi payments), paying Bailey or Relief Defendant Borg Global, and paying purported gold and diamond vendors; (3) had taken few steps to lease or monetize any SBLC; and (4) did not disclose that neither Bailey nor Borg Bank had successfully "monetized" any SBLCs.

42.     The above false and misleading statements regarding the use of investors' funds were material to investors and potential investors because, among other things, the returns Borg Bank, through Bailey, promised investors were tied to the deployment of investor funds to lease and monetize SBLCs and to generate the substantial returns Borg Bank, through Bailey, had promised to investors.

## 2.     Statements Regarding Investment Risks and Returns

43.     During the Relevant Period, Borg Bank, through Bailey, made materially false and misleading statements in oral and written communications regarding the risk-free nature of the SBLC Program investments and the substantial expected returns on these supposedly risk-free investments.

44.     Borg Bank's SBLC Program APMAs repeatedly stated that investor funds would never be at risk. For example, on or about November 21, 2018, Bailey

sent an investor an SBLC Program APMA which stated, in part: "[a]t no time will the 'Assets' ever be placed at risk of loss . . . during the course of investment, trading, or profits distribution."

45.     Another SBLC APMA sent to an investor on or about April 21, 2022, stated, in part: "Borg Investment Bank will provide a guarantee . . . for the amount of the $125,000 investment from [investor], which guarantees that in the event where BORG [sic] Investment Bank does NOT succeed in the issuing and monetization of the SBLC as meant herein, BORG [sic] Investment Bank will repay the investment amount of $125,000. . . ."

46.     Additionally, Borg Bank, through Bailey, represented orally and in the SBLC Program APMAs that investors would receive returns of up to 16 times an investor's principal in a matter of months. For example, on or about August 4, 2021, Bailey sent an investor an SBLC Program APMA that represented their $50,000 investment would turn into $800,000 in just over a few months and which included the following asset description and payment schedule, among other representations:

**Asset:** Barclays Bank Issued SBLC for 50M EUR to be Leased @ 4% to Asset Client
**Asset:** $50,000.00 USD to secure Project Funding, Low-Interest Loan or Mortgage

. . .

| | |
|---|---|
| Initial Pooled Bank Issued SBLC Instrument: | 50M EUR Leased SBLC |
| SBLC Monetization LTV to Borg: | 40% of SBLC Face Value |
| SBLC Monetization LTV to Project Client: | 10% of SBLC Face Value |
| SBLC Monetization Distribution Method: | Equity/Funding/Loan/Mortgage |
| SBLC Transaction Monetization (10%): | $  5,000,000.00 USD |
| Less SBLC Lease Fees Pool Balance (4%) | -$  1,800,000.00 USD |
| Net Proceeds after SBLC Fees Paid: | $  3,200,000.00 USD |
| Proceeds to Borg Investment Pool (75%): | $  2,400,000.00 USD |
| Proceeds to ██████████ (25%): | $    800,000.00 USD |

47.     The statements regarding the risk of loss and expected returns were false and misleading when made because Borg Bank, through Bailey, (1) had misappropriated and misused the SBLC Program investor funds immediately after receiving the funds and relied on new investor funds to pay earlier investors (*i.e.*, Ponzi payments); (2) had directed investor funds to Bailey personally or to Relief Defendant Borg Global, which created a likelihood of non-payment for new investors; (3) failed to disclose that neither Bailey nor Borg Bank had ever successfully "monetized" any SBLCs; and (4) failed to disclose that Borg Bank did not intend to use investor funds to "monetize" or lease any SBLC.

48.     The above false and misleading statements as to the risk-free nature of the investments and substantial expected returns on investment were material to investors and potential investors because the assurance that an investor could not lose any of their principal would be important to any reasonable investor. In addition, knowing that the promise of substantial returns, including multiples of an

initial investment, was not guaranteed, was not likely, and had never occurred before would have been important to investors who sought to grow the principal of their investment and obtain gains.

### 3.   Statements Regarding Bailey and Borg Bank's Compensation

49.     Borg Bank, through Bailey, also made material misrepresentations with respect to their compensation from SBLC Program investments.

50.     On or around July 15, 2021, August 4, 2021, and September 4, 2021, Bailey communicated to investors through the APMAs that he and Borg Bank were not being compensated for arranging the lease and monetization of SBLCs and would only be paid when they successfully monetized an SBLC and received profits.

51.     Similarly, Borg Bank's SBLC Program APMAs contained payment schedules, usually titled "Annex," that described to investors and potential investors the "profit distribution" of an SBLC Program investment. Those schedules did not disclose any payments from investor money for fees or compensation to Bailey or Borg Bank and instead represented that Borg Bank's money would come from profits from an SBLC investment.

52.     The representations regarding Bailey and Borg Bank's compensation were false and misleading when made because (1) Borg Bank, through Bailey, had immediately compensated itself and Bailey with investor money unrelated to a

18

successful monetization of an SBLC; (2) Bailey had directed payments to his and Borg Bank's benefit from sources other than the profits of an SBLC Program investment, namely from investors' principal; and (3) Borg Bank, through Bailey, did not disclose that it did not intend to monetize SBLCs from banks and would instead direct investor money to other purposes.

53.     The above false and misleading statements regarding Bailey and Borg Bank's compensation were material to investors and potential investors because knowing that Bailey and Borg Bank would take a portion of investors' principal as compensation and that Bailey and Borg Bank's compensation was not solely dependent on the success of an investment would be important to any reasonable investor.

**B.     Borg Bank, Through Bailey, Made False and Misleading Statements in Connection with the Micro-Cap Program.**

54.     In raising funds from investors in connection with the Micro-Cap Program, Borg Bank, through Bailey, made numerous materially false and misleading statements regarding, among other things, the use of investor funds and the "guaranteed" nature of the investment and substantial expected returns.

**1.     Statements Regarding the Use of Investor Funds**

55.     From at least in or about October 2020 through June 2021, Borg Bank, through Bailey, made materially false and misleading statements in oral and written communications in connection with offering and selling investments in the

Micro-Cap Program about the use of investors' funds, including that investors' money would be used to effect gold and diamond deals—buying precious metals and stones in Africa and South America and selling them for a higher price in the United States—and that the profits would be shared with investors.

56.     In the Micro-Cap Program APMAs, Borg Bank, through Bailey, stated that investors' funds would be "place[d] with Borg Investment Bank for investment participation purposes via various capital markets trading or buy/sell activities" and that investors "[made] these funds available to Borg Investment Bank for the purpose of a Micro-Cap Program Contract . . . or optional Gold or Diamond buy/sell Contract. . . ." Borg Bank, through Bailey, represented that "[a]s your Global Investment Banker, [we] will choose the best trading and buy/sell payout activities in utilizing your cash assets." Borg Bank, through Bailey, made these or substantially similar representations in Micro-Cap Program APMAs sent to investors on or around October 31, 2020; February 24, 2021; and March 9, 2021.

57.     When offering the Micro-Cap Program, Borg Bank, through Bailey, also represented to at least two investors, both orally and in writing, including on or around October 31, 2020 and March 9, 2021, that investor money would be used for investments in gold and diamond transactions.

58.     The above false and misleading statements regarding the use of funds for investments for gold and diamond transactions were false and misleading when

made because Borg Bank, through Bailey, had misappropriated and misused

investor funds immediately after it received them and had only used an

insubstantial percentage of investor funds toward purported gold and diamond

transactions.

59.    The above false and misleading statements regarding the use of

investors' funds for the Micro-Cap Program were material to investors and

potential investors because, among other things, the returns Borg Bank, through

Bailey, promised investors were tied to the gold and diamond transactions that

Borg Bank represented they would effect and would have been needed to generate

the returns Borg Bank had promised to investors. These false and misleading

statements were also material to investors and potential investors because an

investor would have understood that Borg Bank, through Bailey, was going to use

their money in the way they described in the Micro-Cap Program APMAs and not

for things unrelated to investments.

## 2.    Statements Regarding Investment Risks and Returns

60.    From at least in or about October 2020 through June 2021, Borg

Bank, through Bailey, made materially false and misleading statements in oral and

written communications in connection with offering and selling investments in the

Micro-Cap Program by, among other ways, representing that investments were not

at risk of loss and that investors would double their investment in 30 days.

61.     Borg Bank, through Bailey, represented orally and in the Micro-Cap
Program APMAs that investors' money was guaranteed and would never be put at
risk of loss. Borg Bank, through Bailey, made these representations in Micro-Cap
Program APMAs sent to investors on or around October 31, 2020; February 24,
2021; and March 9, 2021.

62.     For example, one Micro-Cap Program APMA dated March 9, 2021
stated: "[y]our investment is protected at all times," and "at no time will
the 'Assets' ever be placed at risk of loss…during the course of investment, trading
or profits distribution."

63.     Borg Bank's Micro-Cap Program APMAs further represented that the
investments would double their principal in 30 days. For example, in a Micro-Cap
Program APMA sent to an investor on or around March 9, 2021, Borg Bank,
through Bailey, represented the following, among other representations:

**Borg Micro-Cap Wealth Investment Program:**

| | |
|---|---|
| Initial Amount of Transferred Investment Funds: | $25,000.00 USD |
| Micro-Cap Investment Program Monthly Proceeds: | 100% Fixed |
| Micro-Cap Investment Program Incentives: | Future Invitations |
| Total Length of Micro-Wealth Program: | 30 Calendar Days |
| First Trading Program Proceeds Payment: | $50,000.00 USD |

64.     The statements regarding the risk-free nature of the investments and
expected doubling of returns were false and misleading when made because Borg
Bank, through Bailey, (1) had misappropriated and misused the Micro-Cap

22

Program investor money by directing it to Borg Bank's and Bailey's own uses; (2) had directed investor funds to Bailey personally, to support his other businesses, and to pay earlier investors (*i.e.*, Ponzi payments), which created a risk of non-payment of principal; (3) had taken few steps to facilitate any gold or diamond deals of the type represented to investors; and (4) failed to disclose that Bailey and Borg Bank had never profited beyond a few thousand dollars in prior diamond transactions and never in gold transactions, making it unlikely or impossible to pay the doubling of principal represented in 30 days.

65.    The above false and misleading statements as to the risk-free nature and expected returns on investment were material to investors and potential investors because the assurance that an investor could not lose any of their principal would be important to any reasonable investor. In addition, the promise of substantial returns, including multiples of the initial investment, would have been important to investors who sought to grow the principal of their investment and obtain gains.

**C.    Bailey and Borg Bank Acted with Scienter.**

66.    Bailey knew or was reckless in not knowing, and should have known, that his statements on behalf of Borg Bank regarding the use of investor funds, the risk of loss and expected returns, and their compensation were false and misleading when made.

23

67.     Bailey knew that none of the SBLC investments contemplated in the SBLC Program could close because Borg Bank, through Bailey, did not use the money to pay the full upfront fees to other financial institutions that Borg Bank, through Bailey, said were the basis for raising investor funds. Similarly, Bailey knew that none of the gold and diamond investments in the Micro-Cap Program had ever returned double or triple profits using investor money.

68.     With respect to both the SBLC Program and the Micro-Cap Program, Bailey knew that investor funds would be used to repay earlier investors and to pay for Bailey's personal expenses because Bailey knew about the purchases he made on his own behalf. For those investor funds that Bailey directed to deposit funds in Jones's IOLTA account, Bailey gave disbursement directions to Jones and thus knew he was misappropriating and misusing the investors' funds.

69.     Bailey also knew he would compensate himself and Borg Bank using investor funds regardless of whether Borg Bank successfully "monetized" any SBLCs or completed any gold or diamond deals.

70.     Throughout the Relevant Period, Bailey exercised exclusive control over Borg Bank, was acting within the scope of his authority to make representations on behalf of Borg Bank, and did in fact make the representations described above on behalf of Borg Bank.

71.     The scienter of Bailey is imputed to Borg Bank.

**D.    Bailey and Borg Bank Are Each Liable for Their False and Misleading Statements.**

72.    All of the false and misleading statements detailed above were made in connection with the offer, purchase, or sale of securities issued by Borg Bank, specifically, the SBLC Program and Micro-Cap Program securities.

73.    Bailey determined the content of, and had ultimate authority over, any written materials used to solicit prospective SBLC Program and Micro-Cap Program investors, and Bailey made or directed each false and misleading statement detailed above. Additionally, Bailey signed the APMAs on behalf of Borg Bank, and the documents on their face can be attributed to Bailey and Borg Bank.

**E.    Bailey and Borg Bank Obtained Money or Property from Their Misconduct.**

74.    Bailey and Borg Bank each obtained money by means of the false and misleading statements detailed above.

75.    During the Relevant Period, Borg Bank received more than $1.6 million in funds from investors from the sale of investments in the SBLC and Micro-Cap Programs.

76.    Bailey also received compensation and diverted money from investor funds for his own, non-Borg Bank related uses.

## V.     BORG BANK, THROUGH BAILEY, ENGAGED IN DECEPTIVE CONDUCT TO DEFRAUD INVESTORS.

77.     Borg Bank, through Bailey, engaged in deceptive acts and practices to defraud investors in connection with the offer and sale of securities described above.

78.     In addition to the false and misleading statements identified above, Borg Bank, through Bailey, engaged in other deceptive conduct.

79.     Borg Bank, through Bailey, misappropriated and misused investor funds by, among other things, using them to pay for Bailey's personal expenses and to repay earlier investors.

80.     For example, one SBLC Program investor deposited $118,000 into Jones's IOLTA account on December 7, 2020, as part of an SBLC Program investment. Bailey sent the investor an invoice showing that his $118,000 would be used to pay SWIFT fees (*i.e.*, bank transfer fees) to pay a German bank to secure an SBLC. Two days after the money was deposited, Bailey directed Jones to disburse the funds as follows:

      a.   $47,500 to a company in California that was providing consulting and IT services to another of Bailey's companies, Borg Ethical Mining Association, which had nothing to do with Borg Bank, SWIFT fees, or SBLCs;

26

b. $20,000 to a partner of Bailey's in a prisoner rehabilitation company; and

c. $49,707 to Relief Defendant Borg Global, which Bailey used to buy $3,000 in furs and over $2,000 in furniture, to pay his personal credit cards, and to transfer thousands of dollars to his personal bank account.

81. As another example, on September 24, 2021, after an SBLC Program investor sent $25,000 to Borg Bank via Jones's IOLTA account, Bailey directed Jones to deposit $13,000 of this investor's money into Bailey's personal bank account. Bailey then withdrew $3,000 in cash, made hundreds of dollars of payments to various credit cards, paid over a hundred dollars to an online retailer, made recurring payments for personal technology, and made payments to purported gold and diamond consultants, but used none of this investor's money towards any SBLC-related investment or fee.

82. With respect to the Micro-Cap Program, in March 2021, three Micro-Cap Program investors deposited approximately $96,000 into Borg Global's bank account, where Bailey directed the majority of Micro-Cap investors to deposit their money. The first two investors deposited approximately $71,000, of which $34,000 went to a law firm representing Bailey in a personal real estate transaction that never closed; approximately $2,700 went to Bailey's personal account that he

27

shared with his wife; $2,000 went to a personal loan to an individual consultant for Borg Bank; $3,500 went to other of Bailey's companies; and $23,000 went to foreign individuals and entities purportedly involved in gold and diamond transactions. The third investor deposited $25,000. Of that, $10,000 went to repay an earlier Micro-Cap Program investor; $12,500 went to individuals or entities purportedly involved in gold or diamond deals; $700 went to Bailey's personal account; several hundred dollars went to pay Bailey's credit cards; and $150 was spent on dining.

83.     As stated above, Borg Bank, through Bailey, disseminated statements to investors and potential investors that Bailey, and thus Borg Bank, knew were false.

84.     As part of its inducements to investors and after fraudulently inducing investors to invest in the SBLC and Micro-Cap Programs, Borg Bank, through Bailey, undertook acts to prevent investors from discovering the truth about the fraudulent scheme.

85.     In order to prevent investors from learning that Borg Bank had not invested money in the programs as represented, Borg Bank, through Bailey, used new investor funds to make Ponzi payments to existing investors seeking the return of their investment. At the time Borg Bank, through Bailey, made various payments to existing investors, Borg Bank had no income and often did not have

sufficient assets from sources other than new investor money to make the payments.

86.     In order to assuage investors that their money was being managed and handled responsibly, Bailey engaged Jones, an attorney, as a "paymaster" and directed most investors to make their payments to Jones's firm's IOLTA account.

## VI.   JONES AIDED AND ABETTED BAILEY AND BORG BANK'S FRAUD.

87.     Jones was actively involved in Bailey and Borg Bank's fraud and provided substantial assistance to the fraud. Throughout the Relevant Period, Jones received investor funds, made payments of those funds as directed by Bailey, and retained a portion of the funds as compensation. Before providing services to Bailey, Jones performed a background check on him and discovered Bailey's prior felony conviction.

88.     Although the money he received came from investors, Jones took and executed on unilateral instructions from Bailey regarding the funds he received.

89.     Jones performed these services for the SBLC Program investors and for at least one of the Micro-Cap Program's investors during the Relevant Period.

90.     Jones was aware that having an attorney receive money on behalf of Borg Bank created the appearance of a financial intermediary who was subject to oversight from a disciplinary authority, namely a state bar. Jones himself believed

that Borg Bank's investors felt more comfortable investing with Borg Bank by entrusting their money to an attorney.

91.     Jones did not conduct due diligence on Borg Bank's investors other than to ensure they were not included in the Office of Foreign Assets Control's sanctions list, a list of foreign individuals and entities who have violated or attempted to violate U.S. sanctions.

92.     Jones took a fee of between approximately .5% and 1.0%, with certain dollar minimums, per investor deposit for his services. Neither Jones, Bailey, nor anyone else ever disclosed Jones's fee to investors.

93.     After taking his "paymaster" fee, Jones would disburse the funds according to Bailey's instructions. Bailey had the sole authority to direct where investor money went, and Jones did not disburse investor money without Bailey's authorization.

94.     Jones did not know whether Bailey's disbursement instructions were proper under any investment arrangement and chose not to ask Bailey about the investment arrangements.

95.     Jones received many of the APMAs described above that governed the investment arrangements for the SBLC and Micro-Cap Programs. Jones also maintained a detailed ledger purporting to track all deposit and disbursement activity related to Bailey and Borg Bank for each year he performed services for

them. Despite this, Jones did not review any of the APMAs to confirm that his receipt and disbursement of investor funds was consistent with Borg Bank's commitments. Rather, Jones took Bailey's word that the money was disbursed properly.

96.     By at least November 2019 and continuing through December 2022, Jones received complaints from Borg Bank's investors, many of whom specifically alleged that Borg Bank or Bailey had committed fraud and that Jones was complicit in that fraud. Multiple investors provided Jones with details of the promised investments and supporting documentation.

97.     For example, on November 8, 2019, an individual identifying himself as an early investor and referral agent sent an email to Bailey with copy to Jones, among others. In the email, the investor asked Bailey to "find [it] in [his] heart to pay…all 3 clients [the investor/referral agent] introduced to the Firm." The individual further wrote that he "receive[d] their calls repeatedly asking for recovery of their money invested along with the interest attached to them."

98.     In or about January 2021, Jones received an email titled "FRAUD by your TRUST ACCOUNT" from an SBLC Program investor accusing Jones of using his IOLTA account to facilitate Bailey and Borg Bank's fraud.

99.    In August 2022, another SBLC Program investor told Jones that Bailey was using Jones's role as an attorney "to create assurance and peace of mind with Clients/victims [sic]…which assurances are of course all fake."

100.    In another August 2022 email to Jones, titled "Roosevelt Bailey the FRAUD," an SBLC Program investor recommended that investors copied on the email report Jones to the Florida Bar Association for "assisting this fraud."

101.    Jones did not respond to the investors who emailed him alleging fraud. Instead, Jones forwarded their complaints to Bailey. On one or more occasions, Bailey told Jones, in sum and substance, that Bailey intended to make the complaining investors whole. Despite having access to information about Bailey and Borg Bank's finances and investors, Jones took no steps to confirm Bailey's statements, to confirm whether Borg Bank repaid the investors, or to directly address complaints with individuals who contacted him.

102.    Jones continued to accept investor money on behalf of Borg Bank through October 2022 (and was willing to do so through December 2022), and to direct the money at Bailey's direction in furtherance of the above-described fraudulent scheme.

103.    In mid-2020, after receiving investor complaints, Jones raised his fees from .5% to .65%, or a minimum of $250, per investor deposit, citing to Bailey that he had learned Bailey may be under a federal criminal investigation.

32

104.   In 2022, Jones again raised his "paymaster" fees to 1%, or a minimum of $1,000, per investor deposit, citing the increased workload due to investor complaints.

105.   On or about April 16, 2022, Jones informed Bailey by text message that he was increasing his fees due to the "repeated threats of bar complaints, lawsuits, [and] criminal investigations. . . ." Jones further wrote, "Remember, when the FBI came to interview me regarding the one incident, they recognized your name and expressed concern about my working with you, which tells me that those threats have not been mere lip service despite my own efforts to reassure each complaining investor. . . ."

106.   In July 2022, a large U.S. financial institution closed the IOLTA account of Jones's law firm after an investor reported to that bank that Borg Bank's investment schemes were a fraud.

107.   However, in June 2022, shortly before the account was closed, Jones opened a new account at a different U.S. financial institution and continued to receive and disburse funds on Bailey's behalf through October 2022.

108.   On December 15, 2022, Jones terminated his relationship with Bailey and Borg Bank "due to the recent frequency of concerns expressed by your associates about your performance of agreements involving funds transferred to you using my services."

109.    Between November 2019, when Jones first received an investor complaint about Bailey, and the time Jones terminated his relationship with Bailey in December 2022, approximately $1.4 million in Borg Bank-related investor funds passed through the IOLTA account of Jones's law firm, and Jones took approximately $14,000 in fees.

110.    In the face of the numerous "red flags" and suspicious events that should have alerted him to Bailey and Borg Bank's improper conduct, Jones knowingly or recklessly provided substantial assistance to Bailey and Borg Bank's fraudulent conduct by allowing investor money to flow through his law firm's IOLTA account, disbursing the money at Bailey's direction, and lending the imprimatur of his law firm to Bailey and Borg Bank's unlawful enterprise.

## VII.  BORG GLOBAL RECEIVED PROCEEDS FROM BAILEY AND BORG BANK'S FRAUD TO WHICH IT HAS NO LEGITIMATE CLAIM.

111.    During the Relevant Period, Borg Global received at least $163,000 from Borg Bank's investors.

112.    This money constituted the proceeds of, or was traceable to the proceeds of, Bailey and Borg Bank's violations of the securities laws.

113.    Borg Global has no legitimate claim to the investor money.

114.   Borg Global did not provide any reciprocal services that would entitle it to payment from investor funds.

115.   The funds should be returned to defrauded investors.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Section 10(b) and Rule 10b-5 of the Exchange Act
(Bailey and Borg Bank)

116.   The SEC realleges and incorporates by reference in this claim for relief the allegations set forth above.

117.   Bailey and Borg Bank, directly or indirectly, in connection with the purchase or sale of a security, and by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, knowingly or severely recklessly: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

118.   By engaging in the conduct described above, Bailey and Borg Bank violated, and unless restrained and enjoined will continue to violate, Section 10(b)

of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## SECOND CLAIM FOR RELIEF
### Section 17(a) of the Securities Act
(Bailey and Borg Bank)

119.   The SEC realleges and incorporates by reference in this claim for relief the allegations set forth above.

120.   Bailey and Borg Bank, directly or indirectly, in the offer or sale of securities by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails, acting with the requisite state of mind: (a) employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of one or more untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

121.   By virtue of the foregoing, Bailey and Borg Bank, directly or indirectly, violated and, unless restrained and enjoined, will again violate Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

**THIRD CLAIM FOR RELIEF**
**Aiding and Abetting Violations of the Exchange Act**
**Section 10(b) and Rule 10b-5 Thereunder and Securities Act Section 17(a)**
(Jones)

122.    The SEC realleges and incorporates by reference in this claim for relief the allegations set forth above.

123.    Bailey and Borg Bank violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] and Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

124.    As a result of the conduct alleged herein, between November 2019 and December 2022, Jones aided and abetted Bailey and Borg Bank's violations of the Exchange Act and the Securities Act by knowingly or recklessly providing substantial assistance to Bailey and Borg Bank in furtherance of those violations.

125.    By virtue of the foregoing, Jones, directly or indirectly, aided and abetted and, unless enjoined, will again aid and abet violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

**FOURTH CLAIM FOR RELIEF**
**Disgorgement from Relief Defendant – Pursuant to Sections 21(d)(3), (5) and**
**(7) of the Exchange Act and Equitable Principles**
(Relief Defendant Borg Global)

126.    The SEC realleges and incorporates by reference in this claim for relief the allegations set forth above.

37

127.   Borg Global obtained money, property, and assets that are the proceeds, or are traceable to the proceeds, of the fraud and violations of the securities laws by Bailey and Borg Bank.

128.   Borg Global has no legitimate claim to these illicit proceeds or assets, having obtained the funds under circumstances in which it is not just, equitable, or conscionable for it to retain the funds or assets, and therefore it has been unjustly enriched. Borg Global should be required to disgorge all such ill-gotten gains.  [15 U.S.C. §§ 78u(d)(3), (5), and (7) and equitable principles].

## PRAYER FOR RELIEF

WHEREFORE, the SEC seeks the following relief:

1.   Find that the Defendants committed the violations alleged in this Complaint;

2.   Enter an injunction, in a form consistent with Rule 65 of the Federal Rules of Civil Procedure, permanently restraining and enjoining Defendants and their agents, servants, employees, attorneys, and accountants, and those persons in active concert or participation with them, who receive actual notice of the Final Judgment by personal service or otherwise, and each of them, from engaging in transactions, acts, practices, and courses of business described herein, and from engaging in conduct of similar purport and object in violation of Section 17(a) of

Securities Act [15 U.S.C. § 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder;

3.     Enter an injunction, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently restraining and enjoining Bailey from directly or indirectly, including, but not limited to, through any entity owned or controlled by him, participating in the issuance, purchase, offer, or sale of any security, provided, however, that such injunction shall not prevent Bailey from purchasing or selling securities for his own personal account;

4.     Enter an injunction, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently restraining and enjoining Jones from directly or indirectly, including, but not limited to, through any entity owned or controlled by him, participating in, including acting as a "paymaster" in connection with, the issuance, purchase, offer, or sale of any security, provided, however, that such injunction shall not prevent Jones from purchasing or selling securities for his own personal account;

5.     Order Defendants and Relief Defendant to disgorge all ill-gotten gains received during the period of the violative conduct, plus prejudgment interest thereon, pursuant to the Court's equitable powers and Sections 21(d)(3), 21(d)(5), and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)];

6.     Order Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

7.     Enter an order pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)] prohibiting Bailey from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act (15 U.S.C. § 78*l*), or that is required to file reports pursuant to Section 15(d) of the Exchange Act (15 U.S.C. § 78*o*(d)); and

8.     Grant such other and further relief as the Court may deem just and proper.

## JURY DEMAND

The SEC demands a trial by jury on all claims so triable.


Dated:  July 25, 2024                    Respectfully submitted,


                              By:  */s/* **James P. McDonald**
                              James P. McDonald (NY Bar No. 4823910)
                              Jacqueline Moessner (NY Bar No. 4456521)
                              Rachel E. Yeates (CO Bar No. 45759)
                              U.S. Securities and Exchange Commission
                              1961 Stout Street, Suite 1700
                              Denver, CO 80294-1961
                              Telephone: (303) 844-1000
                              Email:    mcdonaldja@sec.gov
                                        moessnerj@sec.gov
                                        yeatesr@sec.gov

                              *Attorneys for Plaintiff*
                              *U.S. Securities and Exchange Commission*